Argued June 5, affirmed as modified December 27, 1978

BRUSCO TOWBOAT CO. et al, *Appellants,*
*v.*
STATE ex rel STATE LAND BOARD, *Respondent.*
(No. 412016, CA 6407, SC 25702)

STATE OF OREGON, *Respondent,*
*v.*
FORT VANCOUVER PLYWOOD CO., *Appellant.*
(No. 406393, CA 6407, SC 25702)

PORT OF ASTORIA et al, *Appellants,*
*v.*
STATE ex rel STATE LAND BOARD, *Respondent.*
(No. 412017, CA 5989, SC 25702)

589 P2d 712

[ 628-a ]

Alex L. Parks, Portland, argued the cause for petitioners. With him on the brief were Malcolm J. Montague, and White, Sutherland, Parks & Allen, Portland.

Peter S. Herman, Senior Counsel, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and James C. Rhodes, Assistant Attorney General, Salem.

HOWELL, J.

## HOWELL, J.

At issue in these three consolidated cases is the validity of the State Land Board's (hereinafter Board) requirement that, with some exceptions, anyone who maintains a permanent structure on or over state-owned submerged and submersible lands under navigable waters enter into a lease and pay rent. Upon petitions from all parties, we granted review of the decision of the Court of Appeals[1] to consider primarily the following issues:

(1) Whether the state has the power to lease its submerged and submersible lands in this manner, and whether the authority to do so has been given to the State Land Board.

(2) Whether the Board, if it has the authority to impose this leasing program, is calculating its rentals on an improper basis.

(3) Whether the leasing program impairs, or is constitutionally limited by, the rights of riparian owners.

(4) Whether the lease program, if otherwise valid, may be applied to the port districts.[2]

---

[1] 30 Or App 509, 567 P2d 1037, reconsideration denied 31 Or App 491, 570 P2d 996 (1977).

[2] When we granted the petitions for review, we requested the parties to address the following questions:

1) What is the nature of the state's interest in the submerged and submersible lands within this state? What is the nature and source of the State Land Board's interest in those lands? Does the State Land Board have the authority to impose this leasing program?

2) If the State Land Board has the authority to require leases for the use of submerged and submersible lands, may those leases be for the water surface area occupied by structures resting on submerged or submersible lands, or are the leases restricted to the area of submerged or submersible lands occupied by such structures? Why? To answer this question is it necessary to determine whether or how the state owns the waters?

3) Are the private parties and port districts involved in those cases owners of upland abutting the submerged and submersible lands for which leases are sought? If not, do such parties have any interest in the lands for which leases are sought?

4) What is the nature and source of the interest, if any, that an upland owner has in the adjoining submerged and submersible lands? Does such an upland owner have a property right in the adjoining underwater lands

The status of these cases and the details of the Board's leasing program were well described in the Court of Appeals' opinion:

"The first case, an action in ejectment, was commenced by the Board against the Fort Vancouver Plywood Company to compel it either to enter into a lease for or to vacate submerged lands which it used for a log boom. It was treated below as a suit for declaratory judgment and it will be so treated here. The other two cases are suits for declaratory judgment commenced by various tugboat companies and by several port districts seeking to have the Board's leasing program declared invalid. Judgments in all three cases upheld the lease program and this appeal followed. For convenience, all parties challenging the leasing program will be referred to herein as plaintiffs.

"I. THE RULES

"The rules in issue establish a program for leasing state-owned submerged and submersible lands: [3]

" 'Any person engaged in a permanent or long-term use of state-owned submerged or submersible lands not exempted from leasing by statute or these regulations must obtain a lease from the Division. * * *' OAR 141-82-015(1).

"Under the program, leases are required for most long-term uses of submerged and submersible lands which effectively preclude any other use and enjoyment

which can only be taken by the state through the power of eminent domain? Which parties raised this issue below? If owners of uplands have a license for the use of the adjoining submerged and submersible lands, what is the source of the license and why is the license revocable or irrevocable? What effect, if any, does the "wharfing statute," ORS 780.040, have upon these cases?

5) May the State's lease program be applied to the port districts? What authority is granted to the port districts by the terms of ORS 777.120(1) and 777.210(3)?

[3] Submerged lands are lands which lie below the ordinary low-water mark of navigable waters. Submersible lands are lands which lie between the ordinary low-water mark and the ordinary high-water mark in navigable waters, and all other islands, shore lands, or other lands held by or granted to the state by virtue of her sovereignty. The terms submerged and submersible lands are used with reference to both tidal and nontidal waters. ORS 274.005(7) and (8).

[ 630 ]

of such lands and the overlying waters. Thus, leases are required for most industrial and commercial uses including log booms, aquatic cultivation facilities and marinas, as well as for private uses such as houseboat moorages and private docks.[4]

"The rules exempt from the lease program uses which are essentially navigational or in aid of navigation, such as vessels which are temporarily anchored or hove to and temporary log tie-ups. Buoys, channel markers and beacons authorized by state or federal authorities are also exempt.[5] In addition, the legislature has conferred upon riparian owners certain wharfing privileges which are not subject to the lease program. ORS 780.040 provides:

" '(1) The owner of any land lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town or within the boundaries of any port, may construct a wharf

---

[4]
"OAR 141-82-010(2) provides:

" 'Uses of state-owned submerged and submersible lands which require leases include, but are not limited to:

'(a) Aquaculture projects involving the cultivation of aquatic plants and animals for domestic or commercial purposes.
'(b) Industrial and/or commercial business areas.
'(c) Houseboats and houseboat moorages.
'(d) Commercial and workboat moorages.
'(e) Class I marinas.
'(f) Class I private docks, floats, and boathouses.
'(g) Log storage or booming areas including millside log boom areas (both makeup and breakdown areas).
'(h) Other uses not exempted by law.'

"Class I facilities are defined as facilities having a surface area greater than 1,000 square feet or an effective use area of greater than 3,000 square feet. All other facilities are classified as Class II facilities. OAR 141-82-005(17)."

[5]
"OAR 141-82-010(3) provides:

" 'Uses which do not require leases include, but are not limited to:

'(a) Vessels engaged in navigation or navigational aids.
'(b) Temporary log tieups.
'(c) Class II marinas.
'(d) Class II private docks, floats, and boathouses.
'(e) Material removal leases under ORS 274.550 and 274.530.
'(f) Public boatramps—providing that only a nominal fee to cover maintenance of the facility is charged for use by the public.
'(g) Uses exempted by law.' "

upon the same, and extend the wharf into the stream or other like water beyond low-water mark so far as may be necessary for the use and accommodation of any ships, boats or vessels engaged exclusively in the receipt and discharge of goods or merchandise or in the performance of governmental functions upon the stream or other like water.

" '(2) As used in this section, "wharf" does not include new lands created upon submersible or submerged lands by artificial fill or deposit.'

"Under the rules, the leasing process is initiated by filing an application with the Board, OAR 141-82-015(1), which then establishes a minimum annual rental for the parcel sought. OAR 141-82-020(1)(d); ORS 274.040(6). Owners of land abutting the parcel are then notified that they have 14 days in which to exercise their statutory right to lease the land at the minimum rental. OAR 141-82-020(1)(e); ORS 274.040(2). If abutting landowners fail to exercise this right, the parcel is opened to competitive bidding. OAR 141-82-020(1)(f). The Board may reject lease applications which it deems to be contrary to the public interest. OAR 141-82-025(1). The Board is authorized, but not required, to conduct public hearings on the question of whether to issue a particular lease. OAR 141-82-020(2). Leases may be for a period of up to 20 years. OAR 141-82-030.

"The construction of permanent facilities such as those subject to the Board's lease program requires a permit from the United States Army Corps of Engineers. Issuance of such a federal permit is without prejudice to rights of the state regarding construction. Conversely, the Board's rules provide that a lease from the state does not obviate the need for compliance with the Corps of Engineers' permit requirement. OAR 141-82-025.

"All of the plaintiffs, in connection with the ordinary conduct of their business, maintain permanent facilities overlying submerged and submersible lands which are not exempted from the Board's leasing program. With minor exceptions, these facilities preclude the public's use and enjoyment of the lands and waters which overlie

[ 632 ]

them. At least some of the plaintiffs are riparian landowners."[6] [Footnotes 2, 3, & 4 in original text renumbered 4, 5 & 6]

*The Board's authority to require leases*

■■ The Court of Appeals correctly concluded that the Board has the authority to require users of these lands to enter into leases and to pay rental for their use. Plaintiffs do not contest the state's title to the lands in question. *See Land Bd. v. Corvallis Sand & Gravel,* 283 Or 147, 582 P2d 1352 (1978). The legislature has specifically authorized the Division of State Lands[7] to lease state-owned submerged and submersible land. ORS 274.915 provides:

> "Except as otherwise provided in ORS 274.905 to 274.940, the division may sell, lease or trade submersible or submerged lands owned by the state * * *."

*See also* ORS 274.040(1). Plaintiffs argue that this authority was not intended to extend to requiring rental for uses related to navigation, such as moorage facilities, log booms, and other permanent installations maintained by the plaintiffs. They rely on the legislative history of this provision. That history evidences an urgent concern with providing a mechanism for facilitating waterfront commercial and industrial development.[8] However, we do not find, either in the language of the statute or in the legislative history, any suggestion that the leasing authority was to be limited to lands used for purposes unrelated to navigation.

■ The power of the legislature is plenary, except as it may be limited by the federal or state constitution.

---

6 "A riparian landowner is one who owns land which is bounded by a waterway. Black's Law Dictionary 1490 (Rev. 4th Ed 1968)."

[7] The Division of State Lands administers the policies formulated by the State Land Board. ORS 273.041, 273.045. By authorizing the Division to lease the lands in question, the legislature has implicitly permitted the Board to set policy for the lease program.

[8] *See* Minutes of House Planning and Development Committee, April 10 and 11, 1963, and Minutes of Senate Local Government Committee, April 30, May 7 and May 9, 1963.

[ 633 ]

*State ex rel Overhulse et al v. Appling,* 226 Or 575, 585, 361 P2d 86 (1961). Plaintiffs' federal constitutional challenges to the leasing program are addressed later in this opinion. They have not suggested any state constitutional limitations on the legislature's power to authorize the collection of revenue for the use of state-owned lands. In fact, general authority for such legislation is found in article VIII, § 5(2) of the state constitution, which provides:

"The [State Land] board shall manage lands under its jurisdiction with the object of obtaining the greatest benefit for the people of this state, consistent with the conservation of this resource under sound techniques of land management."[9]

Subsection (2) was part of an initiative measure adopted in 1968. Material concerning that measure in the voters' pamphlet shows that the amendment was presented to the voters primarily as a vehicle for enhancing the revenue produced by state lands. Although those materials do not indicate that the measure was intended to provide any new authority for the legislature to authorize the leasing of state-owned lands, there was no suggestion that any limitation on the legislature's plenary power was intended. We find no provision in the state constitution which denies to the legislature (or to the Board) the power to require occupiers of state-owned submerged and submersible lands to enter into leases and compensate the state for their use.

The Court of Appeals' opinion discusses at some length the distinction between the state's proprietary interest in these lands—the *jus privatum*—and its interest or obligation as trustee for the benefit of the public—the *jus publicum.* 30 Or App at 516-21. The accuracy of that summary of the traditional view of

---

[9]Certainly the collection of rental in return for the exclusive occupancy of state-owned lands obtains a greater benefit for the people of the state than does the system for which plaintiffs are contending. We understand plaintiffs' position to be that whoever got there first is entitled to occupy, exclusively and indefinitely, any portion of these state-owned lands so long as the structures which they install do not interfere with navigation.

the nature of the state's ownership of lands under navigable waters has not been challenged here, and we see no need to reexamine it now. We did, at oral argument, raise questions about the constitutional or other predicate for any concept of the *jus publicum* as a special limitation on any attempt by the legislature to abdicate its power to protect the rights of the people of the state. Counsel were unable to enlighten us. There is, however, no need to consider that question in this case because the Board has not attempted to give up that power on the state's behalf. The leasing rules provide:

"82-025 RESERVATION OF RIGHTS

"(1) The Division reserves the right to reject any application for lease which would not be in the best interests of the State of Oregon or contrary to State or Federal law. No lease may be issued if it would result in an unreasonable interference with the public rights of navigation, fishing, recreation, or environmental reasons.

"(2) The Division reserves the right to reject any and all bids received for lease of publicly-owned lands.

"(3) A lease granted under these rules does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining other Federal, State, or local government's assent required by law for the structure or work proposed."

Thus it is clear from the rules themselves that the lease program does not purport to divest the legislature or the Board of the state's power to protect the rights of the public in the state's navigable waters or to pursue other governmental objectives.

*Propriety of the rental formula*

Plaintiffs' petition for review suggests that some confusion has resulted from the Court of Appeals' statement that the state "is the owner of both the navigable waters and the underlying land." 30 Or App at 515-16, n. 7. Ownership of the water was apparently

considered material because the Board, in calculating the amount of rental required for a particular structure, bases its calculation in part on the total amount of water surface area which is occupied rather than on the amount of bed area occupied by pilings, dolphins, or other structural features which actually touch the bed. It also appears from the record that at least some of plaintiffs' structures do not rest on the bed at all, but are anchored only to the adjoining privately-owned riparian land.

■ Plaintiffs insist that it is the public, not the state in its proprietary capacity, which is the owner of the waters of the state. *See* ORS 537.110. We need not reach that question. We conclude, rather, that the parties' concern about the ownership of the water itself is misplaced, and that the Court of Appeals' ruling on that issue was not necessary. The state's ownership of the submerged and submersible lands alone is sufficient to justify the rental which the Board proposes to charge for occupation of the surface of the water.

■ We are aware of no general principle which requires a lessor, whether public or private, to calculate rentals on any particular basis such as the amount of surface area physically in contact with structures. Assuming, although plaintiffs have not submitted any authority to this effect, that when the state is the lessor it must calculate its rentals on a reasonable basis, there is nothing unreasonable about basing that calculation on the amount of the state's land which is effectively occupied and thus unavailable for lease to others or for use by the public, whether or not that occupation is accomplished by physical contact with the land.

Plaintiffs contend that this court, in *Atkinson et al v. Bernard, Inc.,* 223 Or 624, 355 P2d 229 (1960), rejected the theory that the owner of land also owns, and is entitled to exclude others from, the space above that land. *Atkinson* was a suit for an injunction by

landowners near an airport, seeking to prohibit takeoffs and landings over their property. The concern in that case was primarily with noise and vibrations caused by low-flying aircraft. We examined the theories available for analysis, rejected the "privileged trespass" approach to overflights by aircraft as formulated in 1 Restatement 460, Torts § 194 (1934), and held:

> "* * * that whenever the aid of equity is sought to enjoin all or part of the operations of a private airport, including flights over the land of the plaintiff, the suit is for the abatement of a nuisance, and the law of nuisance rather than that of trespass applies." 223 Or at 633.

*See also, Thornburg v. Port of Portland,* 233 Or 178, 376 P2d 100 (1962), another airport noise case, in which compensation for an inverse condemnation was approved on a theory of nuisance rather than trespass.

■ While *Atkinson* clearly held that a landowner may not prevent, as a trespass, every invasion of the airspace above his land, it did not hold that the owner's exclusive possessory rights were limited to the surface of the land itself. Both before and after that decision we have recognized a landowner's right to prevent permanent intrusions above the surface of the land but within the zone of normal use or occupancy. *See, e.g., Austin v. Bloch,* 165 Or 116, 105 P2d 868 (1940) (injunction properly granted to enjoin trespass by, among other intrusions, overhanging wall); *Zerr v. Heceta Lodge No. 111,* 269 Or 174, 184, 523 P2d 1018 (1974) (landowner entitled to removal of encroachment in form of overhanging eaves). We need not determine in this case how far above the surface of the land the owner's right of exclusive possession extends. *See generally,* VI-A American Law of Property, § 28.4 (Casner ed 1954). The owner of the bed of a river is certainly entitled to prevent permanent structures on the surface of the water which preclude other uses of the bed, whether or not they actually rest on the bed itself.

■ We hold, then, that the state, by virtue of its ownership of the submerged and submersible land under navigable waters, has the power to require leases and the payment of rent for the occupation of those lands, and has delegated that power to the Board. We further hold that the basis upon which the Board calculates the rentals has not been shown to be improper.

## Riparian rights to build structures in aid of navigation

■ The next question is whether riparian owners have a right, which may not be taken without compensation, to place permanent structures on the state's submerged and submersible land adjacent to their riparian property.[10] It is clear that, as to riparian owners who have not yet done so, the Board's leasing program does not interfere with any vested rights. The Court of Appeals correctly so held.

---

[10] Only the plaintiff port districts raised in the trial court the issue of a taking of riparian rights without compensation. The other parties are not shown by the record to be riparian owners, although plaintiffs' counsel represented at oral argument that the towboat companies are either riparian owners or the lessees of riparian rights. Plaintiffs' counsel also stated, in response to questions by the court, that there is no "taking" problem with respect to the ports, which are creatures of the legislature. We would be justified, under these circumstances, in refusing to consider the question of riparian rights. However, the right of municipal corporations such as the port districts to compensation if their property is taken by the state was not briefed by the parties, and counsel's concession may not have been a considered one. In other jurisdictions, the courts apparently hold that whether or not a municipal corporation has a right to compensation when its property is taken by the state depends upon the purpose for which that property was held. *See generally,* Annot., 56 ALR 365 (1928); 2 McQuillin, Municipal Corporations § 4.132 (1966). From the agreed facts in this case, it appears likely that at least some of the riparian property owned by the plaintiff port districts would, under the generally accepted approach, be constitutionally protected against an uncompensated taking by the state. Arguably, then, the riparian rights appurtenant to that land would be similarly protected. Because of the importance of the issue to a determination of the overall validity of the Board's leasing program, we proceed to consider the question of riparian rights in this context. However, because we hold below that the leasing program does not interfere with any riparian rights, we need not decide under what circumstances, if any, a port district or other municipal corporation is entitled to compensation when the state takes its property.

Even when considering the legislature's express grant of a riparian privilege to build wharves on state-owned land,[11] this court has consistently described that privilege as one which may be withdrawn at any time before it is exercised. For example, in *Montgomery v. Shaver,* 40 Or 244, 248, 66 P 923 (1901), the opinion describes the wharfing statute as "a permissive statute, which alludes to certain things that may be done, but does not vest any right until exercised. It constitutes a license revocable at the pleasure of the legislature until acted upon." The court spoke at greater length in *Bowlby v. Shively,* 22 Or 410, 420-21, 30 P 154 (1892), *aff'd, Shively v. Bowlby,* 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894):

> "* * * an upland owner on tidal waters has no rights as against the state or its grantees to extend wharves in front of his land, or to any private or exclusive rights whatever in the tide lands, except as he has derived them from the statute. * * * But this act is not a grant: It simply authorizes upland owners on navigable rivers within the corporate limits of any incorporated town to construct wharves in front of their land; it does not vest any right until exercised; it is a license, revocable at the pleasure of the legislature, until acted upon or availed of."

Although *Bowlby* involved tidelands, the state's title to other land underlying navigable waters stands on the same footing and the same principles are applicable. *Land Bd. v. Corvallis Sand & Gravel, supra* at 157-59; *Lewis v. City of Portland,* 25 Or 133, 160, 35 P 256 (1893).

In circumstances where the legislature has not expressly granted permission to occupy the submerged and submersible land, we have held that the riparian owner had, as a matter of custom, been accorded the privilege of doing so, subject to the power of the

---

[11] ORS 780.040, the "wharfing statute," and its predecessors. The present provisions are quoted in full above in the excerpt from the Court of Appeals' opinion. As pointed out there, the statute is not directly involved in this case because the Board has not attempted to require leases for wharves within the scope of the statute.

legislature to regulate or prohibit such occupation. In *Coquille M. & M. Co. v. Johnson,* 52 Or 547, 551-52, 98 P 132 (1908), we held that a riparian owner on navigable water had, in the absence of any statute regulating or prohibiting such activity, the "right" to construct a log boom adjacent to his property. That right, which we termed a "mere franchise," was described in the following quotation:

> " '* * * [R]iparian owners upon navigable fresh waters and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the bed of the river. Its exercise may be regulated or prohibited by the State; but, *so long as not prohibited,* it is a private right, derived from a passive or implied license by the public. * * *' 2 Gould, Waters (2 ed.) § 179 * * *."

That quotation is also made a part of the opinion in *Lewis v. City of Portland, supra* at 163-64. Neither statutes nor the decisions of this court have recognized any irrevocable riparian right to construct structures, even in aid of navigation, on state-owned land.

One case cited by plaintiffs in support of their claim of riparian rights requires additional comment. In *Pacific Elevator Co. v. Portland,* 65 Or 349, 133 P 72 (1913), plaintiff owned a tract, within the city limits, consisting of both upland and the adjoining submersible land. It had never exercised its statutory wharfing privilege. The city proposed to build a wharf on plaintiff's submersible land and on out past the ordinary low water line onto state-owned land. The decision holds that the city was not entitled to do so. It does not, however, as plaintiffs claim, stand for the proposition that wharfing privileges, even though not yet exercised, cannot be taken by the state. It holds only that the legislature, when it authorized the city, in its charter, to provide for the construction of wharves and docks, had not impliedly repealed the wharfing statute and thus revoked private wharfing privileges

within the city, and that the city did not have the power to build wharves on either private or state-owned land without taking the proper steps to acquire the land it proposed to use.

Admittedly, the opinion contains language which might be read as supporting plaintiff's position in this case. At page 401, the opinion describes the wharfing privilege:

"The act of 1862 (Section 5201, L.O.L.) grants the right of wharfage across the state's land out to the harbor line fixed by state authority to the riparian owner. This license has never been revoked by the state but has been reaffirmed by the lawmakers and upheld by the courts."

Then, at page 402, it describes the plaintiff's title to the submersible land over which the city proposed to build:

"* * * Plaintiff has succeeded to the title which the state formerly had in the lots described. Its title is subject to the paramount right of navigation existing in the public and subject to such reasonable regulation as the state through its municipality may prescribe."

The opinion then continues:

"To allow this property to be taken for public use without just compensation would work a great injustice and do violence to the Constitution of Oregon."

The sentence last quoted refers to the land owned by the plaintiff in fee, not to its unexercised wharfing privilege to occupy state-owned land. As to that privilege, the court had concluded earlier in its opinion that the city did not stand in the state's shoes. There was, then, no need to determine whether the state could revoke the privilege before it was exercised without compensating the riparian owner. Earlier cases had, as we have shown, indicated that the state could do so. The decision in *Pacific Elevator* is consistent with those cases. It does not aid plaintiffs here.

We find, then, no authority for plaintiffs' position that riparian owners on navigable waters have a right

to build navigational structures on the state-owned beds adjacent to their property which may not be revoked without compensation prior to its exercise. They haved cited a series of New York cases, some of which appear to hold that riparian owners do have such a right.[12] We are not convinced that these cases stand for everything that plaintiffs claim for them. Assuming that they do, however, only means that New York has recognized a proprietary riparian right which Oregon has not. That choice is within the power of each state. *State Land Bd. v. Corvallis Sand & Gravel Co.,* 429 US 363, 97 S Ct 582, 50 L Ed 2d 550 (1977).

*Structures existing prior to the leasing program*

A more difficult question concerns those structures for which the Board proposes to require leases and which were constructed prior to the institution of the state's leasing program. We are not concerned, in this case, with wharves which the legislature has expressly authorized by ORS 780.040 and its predecessors, and for which the Board does not require leases.

In *Coquille M. & M. Co. v. Johnson, supra,* we held that a riparian owner could, in the absence of legislative prohibition, build a log boom on the riverbed adjacent to his property. There was, however, no occasion in that case to consider whether the state could, after the construction of the boom, require its removal or charge rent for its occupation of state-owned lands. No question of the power of the state was involved in that case.

---

[12]Plaintiffs have cited *City of New York v. Wilson & Co.,* 278 NY 86, 15 NE2d 408 (1938); *Del Balso Holding Corporation v. McKenzie,* 271 NY 313, 3 NE2d 438 (1936); *In re West 205th Street,* 240 NY 68, 147 NE 361 (1925); *White, Gratwick & Mitchell, Inc. v. Empire Engineering Co.,* 125 Misc 47, 210 NYS 563 (1923), *aff'd.* 211 App Div 834, 206 NYS 973 (1924), *aff'd* 240 NY 648, 148 NE 743 (1925), *cert. denied* 269 US 580, 46 S Ct 105, 70 LEd 422 (1925); *Town of Hempstead v. Oceanside Yacht Harbor, Inc.,* 38 App Div 2d 263, 328 NYS2d 894 (1972); *City of New York v. Third Ave. Ry. Co.,* 264 App Div 193, 34 NYS2d 874 (1942); *City of New York v. Swift & Company,* 162 Misc 581, 294 NYS 209 (1936).

*State Land Board v. Sause,* 217 Or 52, 342 P2d 803 (1959), is, however, instructive on this issue. That case was a suit for a declaratory judgment and for an injunction and damages against the defendant whose log dump occupied a narrow strip of what the state claimed was tideland on the Tillamook River. The opinion holds that the property in question was not, in fact, tideland and was therefore not owned by the state. An alternative holding, however, is relevant to our present concerns:

> "The land at the locus in quo, according to the record, has no use and no value except as a means for exacting payment from the upland owner for the benefit of the state. In such a case, in balancing the defeasible right of access by the upland owner to navigable waters and his reasonable use thereof, against the interest of the public to the use of the tideland, it is clear that the use of the lands at the locus in quo by the defendants is reasonable and not injurious to the public use. We believe that the above approach to the problem is a reasonable one. It would be anachronistic if the state of Oregon should adopt a rule of law in 1959 which would treat the state as the king of England was treated in his proprietary capacity before the war for independence. It is our belief that the state has failed to establish that the defendants are committing any wrong upon the locus in quo which entitles it to the relief which it seeks. The evidence fails to show that the state has any need whatever for the strip of purported tideland. The defendant's use of it, if the land is deemed tideland, does not interfere with navigation—to the contrary, it is an aid to navigation. The state, assuming that the strip is tideland, is its owner. If it ever requires the land's use for any public purpose it can obtain its possession." 217 Or at 77-78.

It is clear from the quoted portion of the opinion that we did not regard the riparian owner's occupation of adjacent state-owned tidelands as creating a vested property right which could not thereafter be taken by the state without compensation. We described the riparian owner's right of access to navigable waters as "defeasible," and clearly stated that if the state "ever requires the land's use for any public purpose it can

obtain its possession." There is no suggestion that compensation would have to be paid in such an event.

Plaintiffs, of course, emphasize the other aspect of the quoted portion of the opinion—our refusal to recognize the collection of rent as a "public purpose" which would justify the state's assertion of its proprietary rights in the land. That aspect of the case is no longer controlling. It was decided in 1959. Since that time, both the people[13] and the legislature[14] have approved the Board's managment of these state-owned lands for the purpose of generating revenue. In the *Sause* case, prior to these enactments, we struck a balance between the riparian owner's "defeasible right of access" and the interest of the public in the use of the tideland. Nothing in the decision or its rationale prevents the legislature from striking a different balance. It has now done so.[15]

In view of our repeated description of the riparian privilege to construct navigational structures on state-owned submerged or submersible land as a passive or implied license, the Court of Appeals turned to the private law of licenses to determine the rights of those riparian owners who exercised the privilege before the institution of the leasing program. Between private parties, the general rule is that when expenditures have been made to construct permanent improvements

---

[13] In 1968, by enacting Art VIII, § 5(2) of the constitution, discussed above, authorizing the Board to manage state lands "with the object of obtaining the greatest benefit for the people of this state * * *."

[14] In 1963, by enacting ORS 274.915, discussed above, authorizing the Division of State Lands to lease the state's submersible and submerged lands.

[15] It is not necessary now to determine whether this portion of the *Sause* case was correctly decided. The opinion does not refer to ORS 274.040 which at the times relevant to that case impliedly authorized the leasing of state-owned tidelands for the purpose of generating revenue. It provided in part: "All tide and overflow lands shall be sold or leased only to the highest bidder * * *" and further provided that the upland owner had a preference right to lease or purchase the tidelands at the highest price offered in good faith. Since that time, as we have noted, the legislature has directly authorized the leasing of submerged and submersible land in ORS 274.915.

on another's land in reliance on an express license to do so, the license cannot thereafter be revoked, at least without payment of compensation. This rule is, however, limited to expenditures made in reliance on an express license or agreement, and does not apply where the landowner has not given express permission, but has merely silently acquiesced or failed to object to the improvements. *See, e.g., Heisley et al v. Eastman et al,* 102 Or 137, 152, 201 P 872 (1921); *Shaw v. Proffitt,* 57 Or 192, 213, 109 P 584, 110 P 1092 (1910); *Ewing v. Rhea,* 37 Or 583, 62 P 790 (1900). *See also Brown v. Eoff,* 271 Or 7, 530 P2d 49 (1975). The Oregon cases are collected, and their rationale examined, in Comment, 31 Or L Rev 242 (1952). These cases suggest that when a license becomes "irrevocable" under the general rule, the rights acquired by the licensee are perpetual. However, in *Rouse v. Roy L. Houck Sons',* 249 Or 655, 660, 439 P2d 856 (1968), in which the purported license was for a five-year term, we said:

> "A licensee under such a license who has made expenditures of capital or labor in the exercise of his license in reasonable reliance upon representations by the licensor as to the duration of the license is privileged to continue the use permitted by the license to the extent reasonably necessary to realize upon his expenditures. Restatement of Property § 519(4)."

In that case we did not find the necessary expenditures in reliance on the licensor's representations, and so did not have occasion to apply the Restatement rule.

The Court of Appeals held the rule applicable in this case, however, concluding that riparian owners who had built structures on state-owned submerged and submersible land prior to the Board's institution of its leasing program had done so in reasonable reliance on the continuing availability of their license to occupy that land and were therefore entitled to maintain those structures rent free for whatever period of time was necessary to permit them to recoup their investments.

■ The difficulty with applying the general rule in this case is that, as pointed out above, it has been held applicable only where the license to use the land was express. We have consistently described the riparian owner's license under consideration here as a "passive" or "implied" license. The Court of Appeals, mindful of this problem, found the necessary affirmative license or representation in the decisions of this court which recognized the riparian privilege to construct navigational structures on the state's land. That recognition, however, was of a revocable privilege or license, not of a perpetual license or one of any particular duration. We cannot agree with the Court of Appeals that the legislature is estopped to revoke the privilege by the decisions of this court which declare that only a revocable privilege exists. While application or pronouncement by this court of a rule of property law may create vested rights, our recognition that a privilege exists until prohibited by the legislature does not entitle those who choose to exercise that privilege to assume that the legislature will not act to limit or prohibit it in the future.

■ In short, we find that the Board's requirement that riparian owners who have taken advantage of the legislature's past failure to prohibit their exclusive occupation of the state's submerged and submersible land pay rental for the privilege of continuing to do so in the future does not violate any right of property. Leases may, therefore, be required of those parties who claim riparian status and who have exercised in the past the privileges accompanying that status.

*Constitutional claims*

■ Plaintiffs have renewed in this court the federal constitutional challenges to the validity of the leasing program which they raised in the Court of Appeals. Although we did not, when we granted plaintiffs' petition for review, request additional argument on those challenges, we have considered them and find them to be unpersuasive. We approve the Court of

Appeals' disposition of the arguments based on the Commerce Clause, the Equal Protection Clause of the fourteenth amendment, the supremacy of the Transportation Act of 1940 (49 USCA §§ 902-923), and the Oregon Admission Act. As to the last, we add some further observations.

Section 2 of the Oregon Admission Act provides:

"* * * All the navigable waters of said State, shall be common highways and forever free * * * without any tax, duty, impost, or toll therefor."

This language, which is taken from the Northwest Ordinance of 1787 and is found in the admission acts of a number of the states, was construed by the United States Supreme Court in *Huse v. Glover,* 119 US 543, 7 S Ct 313, 30 LEd 487 (1886). In that case, the State of Illinois had constructed a lock and dam on the Illinois River and charged a toll for the passage of vessels through the lock. This charge was held not to violate the terms of the Ordinance. Citing *Cardwell v. American Bridge Company,* 113 US 205, 5 S Ct 423, 28 L Ed 959 (1885), which had construed the same language in the California Admission Act, the court said that the object of this clause:

"* * * was to preserve the rivers as highways equally open to all persons without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of toll for their navigation. * * * As thus construed the clause would prevent any exclusive use of the navigable waters of the State—a possible farming out of the privilege of navigating them to particular individuals, classes, or corporations, or by vessels of a particular character." 119 US at 547-48.

The leasing program does not violate the clause as thus construed. It does not impose a charge for the use of the navigable waters as a highway, or tend to limit the privilege of navigation to any particular class of persons or vessels. It merely imposes a charge upon those who wish to occupy, to the exclusion of others,

portions of the state's lands in pursuit of their own business activities. The fact that plaintiffs' business activities, or some of them, are dependent upon navigation does not immunize them from such a charge.

*Application of the leasing program to port districts*

■■ Finally, plaintiff port districts contend that even if the leasing program is generally valid, it cannot be applied to them because the legislature has delegated to them the power to use or dispose of the state-owned submerged and submersible lands within their boundaries. The Court of Appeals held that the legislature's delegation to the port districts of authority relating to navigation did not constitute a surrender of the state's power to charge rental for the use of state lands. This issue was correctly resolved in the Board's favor.

In their petition for review, the plaintiff port districts stress the language of ORS 777.210(3), which authorizes the ports to acquire, construct, maintain or operate piers, wharves, docks, boat landings and other facilities "with full power to lease and sell the same, together with the lands upon which they are situated, whether held by the port in its governmental capacity or not." Clearly, this authority to lease and sell the lands upon which navigational and other structures are situated is limited to those lands in which the ports have properly acquired the necessary interest. The statute simply grants to port districts the power to engage in activities of the kinds enumerated. It does not purport to be a grant of state lands for that purpose. The phrase "whether held by the port in its governmental capacity or not" was apparently intended to make it clear that the power to sell or lease port-owned facilities does not depend upon whether they are owned in a proprietary rather than a governmental capacity as was assumed in, for example, *Dix v. Port Orford,* 131 Or 157, 282 P 109 (1929).

In ORS 777.120(1) each port is granted "full control of all bays, rivers and harbors within its limits, and

between its limits and the sea," to the "full extent the State of Oregon might exercise control * * *." There is here no express delegation of authority to occupy or dispose of the state's lands, and we do not believe such a delegation was intended. The statute as a whole[16] discloses an intent to delegate to the ports only the state's power to regulate use of the navigable waters, not its proprietary interest in the lands under them.

■ In summary, then, we hold that the Court of Appeals correctly resolved the issues in this case, with two exceptions. First, its holding that the state owns the navigable waters themselves in a proprietary capacity was not necessary to the resolution of this case. We express no opinion as to whether that conclusion is correct. Second, we hold that the Board is not estopped by the decisions of this court to collect rentals for the occupation of state lands by structures (other than wharves within the purview of the wharfing statute) which were placed on those lands prior to the institution of the leasing program. There is, therefore, no need to remand the case, as the Court of Appeals ordered, for determination of which plaintiffs are entitled to a period of rent-free use of the lands.

In all other respects, the decision of the Court of Appeals is affirmed.

---

[16] "(1) To the full extent the State of Oregon might exercise control or grant to ports the right to exercise control, a port has full control of all bays, rivers and harbors within its limits, and between its limits and the sea. As convenient, requisite or necessary or in the best interests of the maritime shipping and commercial interests of the port, a port may, within its limits:

"(a) Make, change or abolish wharf line in bays, rivers and harbors.

"(b) By ordinance make, modify or abolish regulations for the use of navigation, or for the placing of obstructions in or the removal of obstructions from bays, rivers and harbors.

"(2) A port shall have the authority to engage in the control and prevention of river and stream bank erosion, and the prevention of damage from floodwater and sediment, and to make, establish, change, modify or abolish such rules and regulations to preserve natural resources and prevent estuary and stream pollution within the boundaries of the district."