STATE of Alaska, DEPARTMENT OF
NATURAL RESOURCES, Appellant
and Cross–Appellee,

v.

ALASKA RIVERWAYS, INC., and
Tanana River Properties, L.L.C.,
Appellees and Cross–Appellants.

Nos. S–13249, S–13269.

Supreme Court of Alaska.

May 21, 2010.

Cameron M. Leonard and Mary Ann Lundquist, Senior Assistant Attorneys General, Fairbanks, and Talis J. Colberg, Attorney General, Juneau, for Appellant/Cross–Appellees.

Susan E. Reeves and Brian J. Stibitz, Reeves Amodio, LLC, Anchorage, and Alexander O. Bryner, Feldman Orlansky & Sanders, Anchorage, for Appellees/Cross–Appellants.

Before: FABE, CHRISTEN, Justices, and MATTHEWS, Senior Justice, Pro Tem.*

## OPINION

FABE, Justice.

## I. INTRODUCTION

We are called upon today to decide whether the State of Alaska has the authority to require private parties who construct wharves into adjacent navigable waters to enter into leases. The answer to this question depends on whether the common law right to construct a wharf in front of one's property, which was recognized in territorial days, has given way to the right of the state to require a lease on behalf of all Alaskans for the exclusive use of state-owned land.

We conclude that the Alaska Constitution and the Alaska Land Act have modified the common-law right to wharf out by granting authority to the state to enter into leases with landowners who build wharves over state-owned land adjacent to their property. We therefore uphold the exercise of authority by the Alaska Department of Natural Resources (DNR) to require Alaska River-

---

* Sitting by assignment under article IV, section 11 of the Alaska Constitution and Administrative Rule 23(a).

ways, Inc., a longtime paddlewheel tour boat operator on the Chena River, to enter into a lease. But DNR's leasing decision, issued in 2006, required Alaska Riverways to pay the greater of $1,000 per year or $0.25 per paying passenger for its use of approximately one acre of state riverbed. Because the per-passenger fee violates federal law, we vacate that portion of the leasing decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

The basic facts of this case are undisputed. Alaska Riverways, Inc. and Tanana River Properties, LLC (collectively "Alaska Riverways") operate paddlewheel tour boats on the Chena River in Fairbanks.[1] Alaska Riverways was incorporated in 1953 and has owned the riverside property that is the subject of the current dispute since 1972. In about 1980, Alaska Riverways built a system of floating docks and bulwarks secured to this riverside property for mooring boats and loading passengers. Alaska Riverways' docks and moored boats together occupy about one-third of the width of the Chena River.

Because the Chena River is navigable, the State of Alaska owns the riverbed below the ordinary high water mark.[2] This riverbed land is referred to as "shoreland,"[3] and one whose property borders on a stream or river is known as a "riparian landowner."[4] Alaska Riverways' docks and moored boats float above state shoreland, but Alaska Riverways has never held a lease or permit from DNR.

In 1979 Alaska Riverways filed an application seeking to obtain a lease for use of state shoreland. DNR did not immediately process Alaska Riverways' 1979 lease application due to an "insufficient description" of the subject property. In 1989 DNR began sending letters to Alaska Riverways requesting further information regarding Alaska Riverways' 1979 lease application and seeking to require Alaska Riverways to enter into a lease. Alaska Riverways submitted a new lease application in 1990, and DNR issued a preliminary decision approving it. In 1991 DNR issued a final decision offering Alaska Riverways a ten-year lease. DNR instructed Alaska Riverways to have the lease area surveyed and appraised to determine the lease fee, but Alaska Riverways did not do so and no lease was issued.[5]

Another fifteen years of fruitless lease discussions went by, during which DNR periodically renewed its efforts to require Alaska Riverways to enter into a lease and Alaska Riverways questioned the authority behind and fairness of DNR's shoreland leasing program. Subjects of negotiation included whether Alaska Riverways should be charged back rent and whether the lease fee should be a fixed amount based on appraised value or a variable amount based on Alaska Riverways' passenger count. Further details of the nearly three decades of leasing discussions between Alaska Riverways and DNR are not relevant to the legal issues now before us.

In April 2006 DNR issued a preliminary decision proposing a twenty-five year lease of approximately one acre of shoreland to Alaska Riverways for "$1000 per year or $.25 per paying passenger, *whichever is greater.*" (Emphasis in original.) Because Alaska Riverways owned the adjoining riparian land, the proposed lease was a "preference right" lease under AS 38.05.075(c), which provides that "[t]he owner or lessee of land that fronts

---

1. Specifically, Alaska Riverways, Inc. operates the tour boats, and Tanana River Properties, LLC owns the property used by the enterprise.

2. *See Dep't of Natural Res. v. Pankratz*, 538 P.2d 984, 988 & n. 4 (Alaska 1975) (recognizing that the state has title to the bed of its navigable rivers, including the Chena River).

3. Shoreland is defined by statute as "land belonging to the state which is covered by nontidal water that is navigable under the laws of the

United States up to ordinary high water mark as modified by accretion, erosion, or reliction." AS 38.05.965(20).

4. *See* BLACK'S LAW DICTIONARY 1352 (8th ed. 2004).

5. Eventually, in 1994, Alaska Riverways hired an appraiser who determined that the fair market value for an annual lease of the land underneath the wharves was $925. Alaska Riverways did not enter into a lease following this appraisal.

on shoreland, tideland,[6] or submerged land[7] of the state may be granted a preference right to a lease for the shoreland, tideland, or submerged land without competitive bidding."

DNR gave public notice of its preliminary leasing decision and received public comment. Alaska Riverways objected to the proposed leasing arrangement, opposing "the imposition of a tax on its gross business revenues" and questioning "the authority of the state to impose a permit or lease fee in the first instance." Alaska Riverways also objected to DNR's policy of only requiring leases from commercial users of shoreland. Despite its doubts regarding DNR's authority to require a lease, Alaska Riverways indicated that it had "no objection to a fixed lease amount" as opposed to one based on its passenger count.

In August 2006 DNR issued a final finding and decision approving the leasing arrangement proposed in its preliminary decision and responding to comments from Alaska Riverways and others. Countering Alaska Riverways' various objections, DNR asserted that "[a] riparian owner does not have the right to occupy state shoreland to support commercial uses without any authorization or fee" and that "[r]egardless of whether any part of [the docks] physically touches state shorelands, the [Alaska Riverways] docks have removed a portion of the state-owned bed of the Chena River from public use." DNR also maintained that commercial and non-commercial riparian landowners are not "similarly situated" such that DNR must treat them the same and that 33 U.S.C. § 5(b), which prohibits the state from levying a tax for the use of navigable waters, is inapplicable because "DNR is not charging Alaska Riverways to navigate vessels on the Chena River." Alaska Riverways appealed the August 2006 final finding and decision to the commissioner of DNR, who affirmed it.

**B. Proceedings**

Alaska Riverways then appealed the commissioner's final decision to the superior court. In August 2008 Superior Court Judge Douglas Blankenship issued an opinion reversing DNR's leasing decision, concluding that "DNR does not have the authority to require [Alaska Riverways] to enter a lease in order to exercise its riparian right to wharf out." Although it reversed DNR's leasing decision, "[f]or the sake of completeness" the superior court went on to hold that if DNR could require a lease, the proposed lease would not violate Alaska Riverways' right to equal protection and the proposed fee structure would not violate federal law or otherwise be inappropriate.

DNR appeals from the superior court's reversal of its leasing decision, and Alaska Riverways cross-appeals from the superior court's conclusion that if DNR could require a lease, DNR's proposed leasing arrangement would be consistent with federal and state law.

## III. STANDARDS OF REVIEW

Where the superior court acts as an appellate court reviewing a decision by an administrative agency, we independently review the underlying administrative decision and "give no deference to the superior court's decision."[8] We apply one of four standards in performing this review: (1) the "substantial evidence" test applies to questions of fact; (2) the "reasonable basis" test applies to questions of law that involve agency expertise; (3) the "substitution of judgment" test applies to questions of law that do not involve expertise; and (4) the "reasonable and not arbitrary" test applies to questions about agency regulations and the agency's interpretation of those regulations.[9] The questions posed in this appeal regarding

---

6. "Tideland" is "land that is periodically covered by tidal water between the elevation of mean high water and mean low water." AS 38.05.965(23).

7. "Submerged land" is "land covered by tidal water between the line of mean low water and seaward to a distance of three geographical miles." AS 38.05.965(22).

8. *Nelson v. State, Commercial Fisheries Entry Comm'n,* 186 P.3d 582, 585 (Alaska 2008).

9. *Lakloey, Inc. v. Univ. of Alaska,* 157 P.3d 1041, 1045 (Alaska 2007).

whether the state may require Alaska Riverways to enter into a lease and the legality of the lease terms are questions of law not involving agency expertise. In considering these questions, we will therefore substitute our judgment for that of DNR, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy." [10]

## IV. DISCUSSION

### A. Decision of the Superior Court

In reaching its decision in favor of Alaska Riverways, the superior court held that under the common law in Alaska, Alaska Riverways had a riparian right of access that included "the right to construct a wharf or dock when ... necessary to enjoy access with boats or ships to navigable water." The superior court determined that in Alaska Riverways' case, "[p]ractical access to the point of navigability would include the area of deep water necessary to moor Alaska Riverways' riverboats to its docks as well as the dock space necessary to load passengers." Therefore, the superior court reasoned, "if riparian common law rights of access still exist, the State's decision to require a lease would be equivalent to charging [Alaska Riverways] rent for what [Alaska Riverways] already had a right to use."

The superior court then went on to examine whether "riparian common law rights of access still exist" in light of various sections of the Alaska Land Act [11] that delineate DNR's power to lease state shoreland. The superior court focused on AS 38.05.075(c), which was enacted in 1984 [12] and amended in 1997 [13] and which grants a non-competitive preference right to landowners who wish to lease the state-owned shoreland, tideland, or submerged land adjoining their property. The superior court noted that AS 38.05.075(c) is inconsistent with a common-law wharfage privilege because a riparian landowner possessing a common-law right to wharf out would have no use for a shoreland lease from the state at all, let alone a preference right in obtaining such a lease. The superior court thus reasoned that AS 38.05.075(c) "could be interpreted to abolish riparian owners' common law right to wharf out over state-owned riverbed." But the superior court held that AS 38.05.075(c) could not be applied "retroactively" to abolish Alaska Riverways' right to wharf out because Alaska Riverways built its floating docks in 1980, prior to the enactment of that subsection.

DNR now appeals the superior court's decision in favor of Alaska Riverways, arguing that "under Alaska law, there is no common law wharfage privilege that would permit Alaska Riverways to construct and maintain its dock over state land free from state regulation," and that "[t]he Alaska Legislature has authorized DNR ... to undertake regulation of wharves over shoreland through leases."

### B. Under Common Law, Alaskan Riparian Owners Have a Qualified Right to Wharf Out.

■ The existence, nature, and extent of the riparian right to wharf out is a matter of state law.[14] We therefore begin with an examination of the nature of the common-law right to wharf out in Alaska.

#### 1. Pre-statehood judicial decisions

The right to wharf out in Alaska was addressed by courts prior to statehood in the

---

10. *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003)).

11. AS 38.05.005–.990.

12. Ch. 152, § 30, SLA 1984.

13. Ch. 91, § 18, SLA 1997.

14. *See Fox River Paper Co. v. Railroad Comm'n*, 274 U.S. 651, 655, 47 S.Ct. 669, 71 L.Ed. 1279 (1927) ("[T]he nature and extent of the rights of the state and of riparian owners in navigable waters within the state and to the soil beneath are matters of state law to be determined by the statutes and judicial decisions of the state."); *see also Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 370–71, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). State law in this field is subject to paramount federal regulation regarding navigability under the Commerce Clause of the United States Constitution. *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339 (1926).

context of actions by littoral[15] owners against private parties preventing their access to adjacent tidelands and submerged lands. While we are not "bound by federal judicial rulings entered prior to the date of statehood,"[16] these decisions help to define the context in which our constitutional framers and the first Alaska state legislature acted.

In *Dalton v. Hazelet*, decided in 1910, the Ninth Circuit held: "while in a territory a grant of land bordering on or bounded by navigable waters conveys to the grantee no right or title to the shore or soil below high-water mark, nevertheless such a grantee has the right to a free and unobstructed access to such waters."[17] This right to access includes the right to erect structures over waters "too shoal [i.e. shallow] to be navigable," but only up to the "point of navigability where the necessity for such erections ordinarily ceases."[18] The court noted, however, that a riparian owner's "right of access by means of a wharf or other structure" is subject to " 'the right of [a future state] to regulate the use' " of " 'tide lands and beds of any of its navigable waters.' "[19]

The district court for the Territory of Alaska considered the right to wharf out in detail several years later. In *Alaska Juneau Gold Mining Co. v. Northern Lumber Mills*, the court explained that a riparian owner may construct a wharf

> because he has a right of access to the deep water, and he cannot enjoy that right except by means of a wharf. The right to build a wharf in such cases is not a major

right, not an independent right, not an all-sufficient right. It is a qualified right, having no potency whatsoever except in so far as it is referable and appurtenant to, and is a part of, that other right, called the right of access.[20]

The court defined the right of access as an easement, and as such, the extent of a wharf built to exercise that right must be reasonable.[21] Reasonableness is "dependent upon the purpose for which such access is desired," with reference to "the size and kind of vessels which navigate the stream, and the kind of business done upon it."[22] The court found the proposed wharf in question, which could accommodate large vessels carrying coal and heavy mining machinery, to be necessary and reasonable for a large quartz mining operation.[23] Finally, the court noted that the right of access is one "of which, when once it is vested, the owner can only be deprived in accordance with the established law, and if necessary that it be taken for the public good, upon due compensation."[24]

Shortly before statehood, the territorial court again addressed the rights of a littoral owner, enjoining a defendant from removing gravel from tidelands where the removal would prevent plaintiff sawmill operator who owned adjacent tidelands from constructing a wharf to load lumber on barges and vessels.[25] Relying on *Alaska Juneau Gold Mining Co.*, the court stated: "It is well established that a right of access such as claimed by the plaintiff, is a property right and may be exercised by constructing a wharf, pier or

**15.** "Littoral" means "[o]f or relating to the coast or shore of an ocean, sea, or lake." Black's Law Dictionary 952 (8th ed. 2004).

**16.** *Dresser Indus., Inc. v. Alaska Dep't of Labor*, 633 P.2d 998, 1002 (Alaska 1981).

**17.** 182 F. 561, 573 (9th Cir.1910); *see also Columbia Canning Co. v. Hampton*, 161 F. 60, 64 (9th Cir.1908) (holding that riparian owner is entitled "to free access to the navigable waters" of canal in front of property in Alaska Territory).

**18.** *Dalton*, 182 F. at 573 (quoting *Dutton v. Strong*, 66 U.S. 23, 32, 1 Black 23, 17 L.Ed. 29 (1861)).

**19.** *Id.* (quoting Act of May 14, 1898, ch. 299, § 2, 30 Stat. 409, 413 (1901)).

**20.** 5 Alaska 269, 271 (D.Alaska Terr.1915).

**21.** *Id.* at 274.

**22.** *Id.* at 271–72 (internal quotation marks and citation omitted).

**23.** *Id.* at 279–81.

**24.** *Id.* at 273 (quoting *Yates v. Milwaukee*, 77 U.S. 497, 504, 10 Wall. 497, 19 L.Ed. 984 (1870)).

**25.** *Ketchikan Spruce Mills v. Alaska Concrete Prods. Co.*, 14 Alaska 375, 380, 113 F.Supp. 700 (D.Alaska. Terr.1953).

dock over the intervening tide lands to the navigable waters." [26] As a "legal right," the right of access "may not be impaired without compensation." [27]

These cases make clear that prior to statehood, a riparian owner in the Territory of Alaska, while having no right or title to the soil below, had a common-law right to wharf out that, once vested, could not be taken without compensation. But the exercise of this right had to be reasonable; the wharf could be constructed only to the extent necessary to reach navigable waters, with reference to its intended use.

### 2. *Wernberg v. State*

In *Wernberg v. State*, the only Alaska case since statehood relevant to the case before us, we referred to the "many and varied" rights of riparian owners that, "generally speaking," include the right to "build wharves and piers out to deep water if this can be done without interfering with navigation." [28] DNR characterizes this mention of the right to wharf out as a "passing reference" and "classic obiter dictum," while Alaska Riverways argues that *Wernberg* "firmly establishe[d]" the right to wharf out in Alaska. The riparian rights listed in *Wernberg* were derived from a law review article published several years earlier, [29] and were not specific to Alaska nor, apart from the right of "access to navigable waters," discussed in any detail in the opinion. It does not appear that the plaintiff in *Wernberg* had built or maintained a wharf.

*Wernberg* involved a challenge to the state's construction of a highway preventing plaintiff's historical access to the Cook Inlet with his fishing boats via the creek and tidewaters adjacent to his property. Confirming

the importance of the common-law right of access in Alaska, we held that this interference could constitute a taking requiring compensation. [30] We expressed a concern that a contrary holding might devalue riparian property:

> Alaska has a seacoast longer than that of the entire United States. A large number of Alaskan communities are located on the shores of bays and inlets in order to gain water access for transportation and shipping, or easy access to the fertile fishing grounds of Alaska. A substantial amount of development in these cities is along the waterfront.... [A] declaration that littoral access may be taken for any public purpose without compensation will immediately devalue property in such areas and limit the development of many isolated communities whose only means of access is by water. [31]

While recognizing the importance of the right of access in Alaska, we also noted that "the rights of riparian owners are not absolute," but are "subject to those general regulations, which are necessary to the common good and general welfare," exercised pursuant to the state's police power. [32] We concluded that the Alaska Constitution, while authorizing the state to take plaintiff's right of access to construct a highway, [33] also required it to compensate plaintiff for his loss of access. [34]

While *Wernberg* made a generalized statement that the right to wharf out was included among the rights of a riparian owner, it did not specifically address the scope and limitations of this right, nor whether it had been altered by the Alaska Constitution or by statute. Rather, *Wernberg* addressed a ri-

---

26. *Id.* at 378, 113 F.Supp. 700.

27. *Id.* at 379, 113 F.Supp. 700.

28. 516 P.2d 1191, 1194–95 (Alaska 1973).

29. *Id.* at 1194 (citing Richard Harnsberger, *Eminent Domain and Water Law*, 48 Neb. L.Rev. 325, 381–82 (1969)).

30. *Id.* at 1201; *see also id.* at 1194–95 (noting that riparian rights "are valuable property, and ordinarily cannot be taken for public use by the

federal or state governments without payment of just compensation to the landowner").

31. *Id.* at 1200–01 (footnote omitted).

32. *Id.* at 1195.

33. *See id.* at 1198 ("[T]he Alaska Constitution does indeed allow the state to take riparian or littoral property rights for 'beneficial or public uses' other than in aid of water navigation.").

34. *Id.* at 1199, 1201.

parian owner's right of access, holding that the state may not take a riparian owner's right of access to navigable waters without compensation. It does not necessarily follow from this holding that the state may not require an owner who builds a wharf over state land to enter into a lease. For these reasons, *Wernberg* is not controlling.

We next consider to what extent the common-law right to wharf out that was recognized in territorial days has been limited by the public trust doctrine, the Alaska Constitution, and actions by the Alaska Legislature, and whether any of these sources authorize DNR to require a riparian owner that builds a wharf over state land to enter into a lease.

**C. The Public Trust Doctrine Does Not Support Requiring Riparian Owners Who Exercise Their Right To Wharf Out To Enter into a Lease.**

■ DNR argues that its attempt to require Alaska Riverways to enter into a lease is a proper exercise of its general authority to regulate the use of state waterways under the public trust doctrine.[35] DNR thus believes that this case pits the common-law right to wharf out against the public trust doctrine and that the former must accommo-

date the latter. We conclude that DNR's authority to require riparian owners to enter into leases for the use of shoreland arises, if at all, independent of the public trust doctrine.

■ Under the public trust doctrine, the state holds title to the beds of navigable waters "in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties."[36] It may therefore subject a riparian owner to "general rules and regulations ... for the protection of the rights of the public."[37] The right to wharf out, like all riparian rights, is not absolute, but is limited by the state's exercise of its authority under the public trust doctrine.[38]

■ The common-law public trust doctrine has been incorporated into the constitution and statutes of Alaska. Article VIII, section 14 of the Alaska Constitution provides that "[f]ree access to the navigable or public waters of the State ... shall not be denied ... except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes."[39] The

---

**35.** In fact, DNR claims that "[t]he *only* way that the state can effectively manage its shoreland and know what riparian landowners like Alaska Riverways are planning to build, and so fulfill its trust duties, is to require riparian landowners to go through an approval process," which "takes the form of leasing procedures." (Emphasis added.)

**36.** *CWC Fisheries, Inc. v. Bunker*, 755 P.2d 1115, 1117–18 (Alaska 1988) (quoting *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 452, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)). In both *CWC Fisheries* and *Illinois Central Railroad*, the courts relied on the public trust doctrine to condition or set aside a state's conveyance of submerged land to a private party where the conveyance failed to accommodate certain public uses of the land. Since there has been no state conveyance here, this particular application of the public trust doctrine is not relevant. Rather, DNR relies on the public trust doctrine more broadly to support "the state's authority as sovereign to exercise a continuous supervision and control over navigable waters of the state and the land underlying the waters."

**37.** *Illinois Cent. R.R. Co.*, 146 U.S. at 446, 13 S.Ct. 110. The power to pass these regulations has also been described as deriving from the

state's police power to regulate for the common good. *See Wernberg*, 516 P.2d at 1195; A. Dan Tarlock, Law of Water Rights and Resources § 3:74 (1988) ("The right to wharf out ... is subject to police regulation....").

**38.** *Wernberg*, 516 P.2d at 1195; *see also New Jersey v. Delaware*, 552 U.S. 597, 128 S.Ct. 1410, 1421, 170 L.Ed.2d 315 (2008) ("[T]he right of a riparian owner to wharf out is subject to state regulation."); 78 Am. Jur 2d Waters § 43 ("While a riparian landowner has certain rights which inhere in the ownership of land adjacent to a body of water, these rights are subject to reasonable regulation by the state in the exercise of public trust rights."); Herbert T. Tiffany and Basil Jones, 2 Tiffany Real Property § 666 (2009) ("The exercise of the right is subject to the proviso that it be not exercised in such a way as substantially to interfere with navigation, and it is subject to any restrictions in this behalf imposed by the state or by authority of the state.").

**39.** *See Wernberg*, 519 P.2d at 803 ("the Alaska Constitution does indeed allow the state to take riparian or littoral property rights for 'beneficial or public uses' "); *see also* AS 38.05.126(b) ("The state has full power and control of all of the

legislature codified the public trust doctrine as applied to riparian and littoral landowners in AS 38.05.126(c), enacted in 1999:

> Ownership of land bordering navigable or public water does not grant an exclusive right to the use of the water and a right of title to the land below the ordinary high water mark is subject to the rights of the people of the state to use and have access to the water for recreational purposes or other public purposes for which the water is used or capable of being used consistent with the public trust.

Under the public trust doctrine, the state can regulate a riparian owner's use of adjacent state-owned lands to protect recreational and other public purposes, including "the right to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes." [40]

None of these public trust uses are implicated in this case. In its preliminary decision, DNR explicitly found that "restricting public access to [Alaska Riverways'] lease parcel will not substantially impair the public's interest in trust resources." [41] Instead, DNR sought a lease with Alaska Riverways for its exclusive use of state land in order that "all Alaskans [ ] receive a return from any commercial use of their public lands." Even construing the public trust doctrine broadly, it does not permit the state to "reg-

ulate" riparian owners by requiring them to pay rent for the use of state lands. The collection of rent is simply not a public purpose that the state has an obligation to protect under the public trust doctrine.

■ The public trust doctrine, as expressed in the common law, the Alaska Constitution, and Alaska statutes, does not support DNR's efforts to require riparian owners to enter into leases. It does, on the other hand, support the regulation of the exercise of riparian rights, including the right to wharf out. DNR may use its leasing program, or any other regulatory program authorized by the legislature, to regulate the construction and maintenance of wharves over state-owned land to protect public uses of the waterways, but it has not done so here.

### D. Under the Alaska Constitution, a Riparian Owner Does Not Obtain a Protected Property Interest in State Lands by Constructing a Wharf.

Article VIII of the Alaska Constitution, the natural resources section, places all state lands under the control of the legislature.[42] Tidal and submerged lands are expressly included in the state public domain.[43] The legislature has plenary authority to provide for the utilization of state lands by providing for facilities and improvements,[44] sales and grants,[45] and, most relevant here, leasing.[46] No disposal of state lands or interests in

---

navigable or public water of the state, both meandered and unmeandered, and the state holds and controls all navigable or public water in trust for the use of the people of the state.").

**40.** *Hayes v. A.J. Assocs., Inc.,* 846 P.2d 131, 133 n. 6 (Alaska 1993).

**41.** Alaska Riverways suggests that if DNR found *any* impairment of public trust uses, then it could not issue the lease, further evidence that DNR is not acting pursuant to its authority under the public trust doctrine. This is incorrect. DNR can impose "limitations, conditions and terms" on a lease to protect the public interest, such as requiring a public easement allowing the public to use the wharf, rather than outright denying a lease. AS 38.05.070(b).

**42.** Article VIII, section 2 provides:

The legislature shall provide for the utilization, development, and conservation of all nat-

ural resources belonging to the State, including land and waters, for the maximum benefit of its people.

**43.** Article VIII, section 6 provides:

Lands and interests therein, including submerged and tidal lands, possessed or acquired by the State, and not used or intended exclusively for government purposes, constitute the state public domain. The legislature shall provide for the selection of lands granted to the State by the United States, and for the administration of the state public domain.

**44.** Alaska Const. art. VIII, § 5.

**45.** Alaska Const. art. VIII, § 9.

**46.** Article VIII, section 8 provides:

The legislature may provide for the leasing of, and the issuance of permits for exploration

state lands can be made without public notice and other safeguards of the public interest.[47] Article VIII permits rights to be established by appropriation in only two instances, neither of which includes the right to appropriate an interest in state shoreland by building a wharf over such land.[48]

Alaska Riverways argues that by virtue of being a riparian owner, it has a protected property right to wharf out over state land, and that DNR's requirement that Alaska Riverways enter into a lease is "an attempt to generate revenue by charging [Alaska Riverways] for a property right [it] already possesses." Yet, article VIII's prohibition on disposal of state lands or interests in state lands without public notice and other safeguards is inconsistent with the creation of a protected property interest in state lands simply by being a riparian owner, or by constructing a wharf over state lands. So too is article VIII's strict limitation on instances in which a person can obtain an interest in Alaska lands by appropriation.

■ In arguing that it possesses a protected property interest, Alaska Riverways relies heavily on section 16 of article VIII,[49] which it claims recognized the common-law right to wharf out as it existed in territorial days. The commentary prepared by the Resources Committee of the Constitutional Convention with respect to this section states:

> This section, protecting any person from involuntary divestment of property rights

and interests, is generally applicable to any established right and might be relied upon to protect persons who claim possessory rights to tidelands in coastal areas where substantial improvements have been made in docks, wharves or other waterfront facilities and homes.[50]

A proper understanding of section 16 and the committee commentary requires that it be viewed in historical context. At the time of the constitutional convention much of the infrastructure of the territory was built over tidelands owned by the United States.[51] This included docks, warehouses, streets, hotels, stores, schools, private residences, and much of the commercial sections of Juneau, Ketchikan, Cordova, and Valdez.[52] The United States took the position that most of these facilities were trespasses, though it had no desire to abate them.[53] The reference to "improvements" in section 16 as explained in the commentary was intended to address this problem by recognizing that where "substantial improvements *have been made*" on tidelands as of the time of statehood, a protected property right would arise. Yet as to unimproved tidelands, the delegates were advised that the state legislature would have "full power insofar as the disposition of surface rights for the building of ... docks [and] wharves ... is concerned; the legislature may sell the lands in these cases, should it desire to do so."[54] Properly understood, section 16 establishes that substantial im-

of, any part of the public domain or interest therein, subject to reasonable concurrent uses. Leases and permits shall provide, among other conditions, for payment by the party at fault for damage or injury arising from noncompliance with terms governing concurrent use, and for forfeiture in the event of breach of conditions.

47. Article VIII, section 10 provides:

No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law.

48. The permitted instances of appropriation concern mineral rights and rights to surface and subsurface water. *See* Alaska Const. art. VIII, §§ 11, 13.

49. Article VIII, section 16 of the Alaska Constitution provides:

No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law.

50. *Commentary on Article on State Lands and Natural Resources*, 6 Proceedings of the Alaska Constitutional Convention, App. V at 103 (Jan. 16, 1956).

51. S.Rep. No. 85–1045 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1933, 1935–37.

52. *Id.* at 1936.

53. *Id.*

54. Alaska Statehood Committee, 1 Constitutional Studies· The Alaskan Constitution and the State Patrimony 71 (Nov. 8, 1955).

provements on tidelands that existed at the time of statehood would give rise to protected property rights while tidelands that were unimproved at the time of statehood would be state property that could be disposed of only in accordance with the other provisions of article VIII.

 In summary, article VIII placed control of all state land, including shoreland, in the legislature. After statehood, a riparian owner could not obtain a protected property interest in state shoreland through the purchase of the riparian land or by constructing a wharf. While article VIII authorized the legislature to "provide for the leasing of . . . any part of the public domain," including submerged land,[55] it did not itself grant DNR authority to require riparian owners who construct wharves to enter into leases for their use of state shoreland. We now examine whether the state legislature granted DNR such authority, and in doing so determined that the private common-law right to wharf out should yield to the public interest in earning revenue from the exclusive use of state land by a riparian owner.

### E. The Legislature Has Expressly Granted Authority to DNR To Require Upland Owners Who Wharf Out To Enter into Leases.

 The first Alaska state legislature enacted the Alaska Land Act [56] pursuant to the mandate of article VIII, section 2 of the Alaska Constitution that the legislature "provide for the utilization, development, and conservation" of all state land. Alaska Riverways argues that the Alaska Land Act and its subsequent amendments do not grant DNR statutory authority to lease shorelands to riparian owners. We disagree and conclude that the Alaska Land Act as first enacted in 1959 authorized DNR to require riparian owners to enter into leases for exercising their common-law right to wharf out.

### 1. Alaska Statute 38.05.070

DNR argues that AS 38.05.070, which was enacted as part of the Alaska Land Act,[57] authorized it to charge riparian owners rent and "abolished" any "common law right to wharf out." [58] Alaska Riverways argues that this statute instead "grant[ed] DNR authority to lease shorelands *to anyone but riparian landowners.*" [59] (Emphasis in original.)

When it was enacted upon statehood in 1959, AS 38.05.070 provided:

> All lands, including any tide, submerged or shore lands, to which Alaska holds title or to which Alaska may become entitled, may be leased . . . in the manner provided in this Article.

The lands to be leased would be determined by the director of the Division of Lands of

---

**55.** Alaska Const. art. VIII, §§ 6, 8. Even if the Alaska Constitution did not explicitly authorize the legislature to provide for leasing of shoreland, the legislature is free to modify the common-law right to wharf out as long as doing so would not conflict with any constitutional provision. *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1068–69 (Alaska 2002) ("[T]he legislature is free to modify or abolish common law rules."). Counsel for Alaska Riverways conceded at oral argument before us that the "legislature has the absolute right to change [the common-law right to wharf out] when it wants to, it's a common law rule."

**56.** Ch. 169, SLA 1959.

**57.** Ch. 169, art. V, § 1, SLA 1959.

**58.** Alaska Riverways contends that DNR waived its argument that AS 38.05.070(a) authorized its leasing proposal by failing to raise the statute in the proceedings below, and instead relying solely on AS 38.05.075(c). To the contrary, DNR spe-

cifically mentioned AS 38.05.070 as a source of leasing authority in its leasing decision and the commissioner of DNR's appeals decision, which were reviewed by the superior court. In any event, DNR's supposed failure to cite AS 38.05.070 as statutory authority for Alaska Riverways' proposed lease would not preclude us from considering whether AS 38.05.070 generally restricted the common-law right to wharf out as recognized by the territorial courts.

**59.** In support of this interpretation, Alaska Riverways relies on "common law from Alaska's territorial courts, the Alaska Constitution, [and] *Wernberg*." Alaska Riverways also cites the first subsection of AS 38.05.070, which directs DNR to "preserve reasonable and traditional access to state land and water" in making its leasing decisions. But this language was not added until 1984, as part of the amendments to Chapter 38 that first granted preference rights to littoral owners. Ch. 152, § 27, SLA 1984. It is therefore of no assistance in determining the intent of the legislature in passing leasing provisions in 1959.

DNR, along with "limitations and conditions that shall attach to the lands and the terms that shall accompany the lease." [60] The leasing would be conducted "at public auction to the highest qualified bidder" unless the total appraised value of the transaction was $250 or less per year, in which case DNR could negotiate the lease directly "without advertisement." [61]

The text of AS 38.05.070 and the other leasing provisions make no reference to riparian owners, let alone explicitly state that DNR cannot lease shorelands to riparian owners. The statute authorizes DNR to negotiate leases of up to five years whose total appraised value is $250 or less per year, imposing no limitation on the identity of the lessee. The statute further authorizes DNR to hold public auctions to lease lands it has selected. There is nothing in the statute that prevents a riparian owner from submitting a bid for adjacent shoreland. If AS 38.05.070 did not grant DNR authority to lease shoreland to riparian owners, as argued by Alaska Riverways, DNR would either have to reject such a bid, or else be unable to put *any* shoreland (or tide or submerged land) adjacent to private property up for auction in the first place. Alaska Riverways' construction of AS 38.05.070 would thus exclude the parties who would be most interested in leasing state-owned lands, the adjacent land owners, from the leasing program or substantially undercut DNR's ability to exercise its statutory authority. We find this construction to be untenable.

Consistent with article VIII, section 16 of the Alaska Constitution, the Alaska Land Act also granted explicit rights to those who had constructed wharves or other "substantial permanent improvements" on tide and submerged lands "for any business, residential or other beneficial purpose" prior to statehood.[62] Such "occupants" were given a preference right to acquire the tide and submerged land either from a municipality, if such land was transferred from the state, or directly from the state.[63] If the improvements were constructed prior to September 7, 1957, the occupant could acquire the land for the cost of surveying and transferring title; if the improvements were constructed after that date and prior to statehood, the occupant could acquire the land for its appraised value, plus appraisal, administrative, and transfer costs.[64] Occupants had two years from the date the municipality or DNR began accepting applications to apply for preference rights, or else they would be lost.[65] The provision did not differentiate between occupants who owned adjacent upland property, nor did it grant any rights to those constructing improvements after statehood, whether owners of adjacent land or not.

Reading these two provisions together, a legislative framework emerges. Persons who had constructed improvements on tide and submerged land prior to statehood were granted special preference rights to purchase or lease these occupied lands, but those rights would expire if unused. DNR was authorized to enter into leases with all other parties, including upland owners, for their occupancy of state lands either directly if the lease was appraised at $250 or less, or after public auction. To this extent, AS 38.05.070 restricted the common-law right to wharf out when it was passed in 1959.[66]

The DNR lease application forms used by Alaska Riverways in 1979 are consistent with this statutory construction and suggest that DNR since at least that time has interpreted its statutory authority to include

---

60. Ch. 169, art. V, § 1(1), SLA 1959.

61. *Id.* art. V, §§ 1(1), 2.

62. Ch. 169, art. III, § 5(2)(a), SLA 1959.

63. *Id.* art. III, §§ 5(2)(a), (3), (4).

64. *Id.* art. III, §§ 5(2)(e), (g).

65. *Id.* art. III, §§ 5(3)(f), (4)(d).

66. DNR argues that the legislature's passage of laws inconsistent with this common-law right "reflects that the legislature at that time did not recognize a common law right to wharf out" and means that "such a common law privilege simply does not exist in Alaska." This argument is without merit. The legislature has the power to abrogate common law rules and even if the laws did reflect the opinion of the legislature that there was no common-law right to wharf out, it would not be controlling.

leasing to upland owners.[67] If the applicant was not the upland owner, the application requested the names and addresses of the upland owners in addition to adjacent land owners. The application further gave notice to the applicant that the applicant may have to provide a deposit to cover the cost of advertising a public auction, which would be returned "[i]f advertisement of this land is required and the land is leased to another party." The application thus contemplated the possibility that DNR would conduct a public auction to lease shoreland, tideland, and submerged land adjacent to upland owners and ensured that DNR had the names of the landowners most likely to be interested in participating or otherwise affected.

## 2. Alaska Statute 38.05.075(c)

The Alaska Land Act was substantially revised in 1984, including changes to the leasing program.[68] A provision was added under which an upland owner would be "entitled to acquire a lease for the [adjacent] tide and submerged land without competitive bidding" regardless of the value of the lease if DNR made certain determinations.[69] This modification to the leasing program was proposed by an executive of the Sealaska Native Corporation who testified before the Senate Resources Committee.[70] After noting that the development of Sealaska's 1,000 miles of coastal property was dependent on access to state-owned tidelands, the witness suggested that the "creation of an upland owner's preference" would "facilitat[e] transportation and commerce from adjacent uplands, which is vital to upland economic development."[71]

The provision was presented and adopted at the next meeting of the Resources Committee.[72] The provision, proposed by an owner of a large amount of land bordering tideland and submerged land, was meant to *expand* the rights of littoral owners by entitling them to noncompetitive leases for adjacent property, not to *restrict* their rights by authorizing DNR to lease tideland and submerged land to them when they could not do so before.

Support for this interpretation of AS 38.05.075(c) and DNR's authority to enter into leases with upland owners prior to its enactment can be found in the Senate Resources Committee files. The text of the provision proposed by Sealaska, which specifically related to upland owner leases, was circulated among committee members prior to its adoption with the following note from committee staff: "Leases for tide and submerged lands are currently available through the competitive bidding process. Under current statute, any lease for a term of less than 5 years and valued at less than $250 annually may be negotiated."[73] After the amendment had been adopted by the committee, a summary of major provisions of the amendments to the Alaska Land Act described it as "[p]rovid[ing] a mechanism for DNR to negotiate leases for tide and submerged lands with upland land owners without competitive bidding," whereas under the former leasing procedures, "[l]easing is made at auction to the highest qualified bidder."[74]

In 1997, AS 38.05.075(c) was amended to authorize DNR to grant preference rights to

---

67. Although we generally apply our independent judgment to matters of statutory interpretation, we will apply a more deferential standard of review where an agency interpretation is "longstanding and continuous." *Premera Blue Cross v. State, Dep't of Commerce, Community & Econ. Dev.*, 171 P.3d 1110, 1118–19 (Alaska 2007).

68. Ch. 152, SLA 1984.

69. *Id.* § 30, SLA 1984. In particular, DNR must determine that: (1) the lease is necessary for a water-dependent purpose, (2) the proposed use is compatible with the classification of the land and with any applicable land use plan, and (3) issuance of the lease will not interfere with prior existing rights. *Id.*

70. *An Act Relating to Land Disposal and Management: Hearing on S.B. 375 Before the S. Resources Comm.*, 1984 Leg. (Alaska February 20, 1984) (written testimony of Robert W. Loescher, Vice President, Resource Management, Sealaska Corp.).

71. *Id.*

72. *An Act Relating to Land Disposal and Management: Hearing on S.B. 375 Before the S. Resources Comm.*, 1984 Leg. (Alaska February 27, 1984).

73. *Id.* (Amendment No. 9, Tideland Lease).

74. *S. Resources Comm., Summary of Major Provisions of C.S.S.B. 375(Res)* (March 5, 1984).

riparian owners leasing adjacent shorelands in addition to owners leasing adjacent tidelands and submerged lands.[75] In its current form, the provision states: "The owner or lessee of land that fronts on shoreland, tideland, or submerged land of the state may be granted a preference right to a lease for the shoreland, tideland, or submerged land without competitive bidding" if the director makes certain determinations. Alaska Statute 38.05.075(c) clearly authorizes DNR to directly negotiate leases of any value with upland owners who construct wharves.[76] We therefore reject Alaska Riverways' argument that DNR is not authorized by statute to require it to enter into a lease for its exclusive use of state-owned shoreland.

### F. Alaska Riverways' Challenge to DNR's Requirement that It Enter Into a Lease for Wharfing Out over State Land.

In addition to challenging DNR's statutory authority, Alaska Riverways advances several arguments for why DNR may not require it, as a riparian owner, to enter into a lease for wharfing out over state land. First, it contends that DNR's leasing decision constitutes an impermissible taking under article VIII, section 16 of the Alaska Constitution. Second, it contends that DNR's application of AS 38.05.075(c) to require it to enter into a lease for its maintenance of a dock built prior to the passage of that statute would constitute an improper retroactive application of law. Third, it argues that DNR's leasing

decision violates its equal protection rights under the state and federal constitutions.[77] We consider each argument in turn, and find them to be without merit.

### 1. DNR's leasing decision does not violate article VIII, section 16 of the Alaska Constitution.

Alaska Riverways argues that DNR's application of AS 38.05.075(c) to require it to enter into a lease for maintaining its docks violates article VIII, section 16 of the Alaska Constitution. As discussed above, section 16 only protects property rights in wharves that were constructed prior to statehood. Riparian owners who have constructed wharves since statehood gained no protected property interest by doing so.[78] Alaska Riverways did not construct the wharf at issue in this case until around 1980 or even acquire its current property until the early 1970s, well after statehood.

Alaska Riverways argues that the date on which "a riparian landowner purchased the property or built a dock" is irrelevant to obtaining a protected property interest because the right to wharf out "attach[es] to the land." To the contrary, under territorial common law, riparian owners had to first exercise their right to wharf out before they acquired protected property rights that could be divested; they could not make this showing based on the existence of an abstract riparian right they acquired through purchase of the land.[79] Having built its wharf

---

75. Ch. 91, § 18, SLA 1997.

76. While DNR is authorized to require upland owners who wharf out to enter into leases, we note that DNR issued a regulation in 2002 that expressly exempts upland owners who build docks for their personal, non-commercial use from any permitting or other written requirements, which would include leases. 11 Alaska Administrative Code (AAC) 96.020(a)(2)(B). To qualify for this exemption, the dock must "not interfere with public access or another public use." *Id.*

77. Alaska Riverways also argues that it does not actually "use" or "occupy" any state property because its docks float on the surface of the river without physically contacting the state-owned riverbed and therefore DNR may not require it to enter into a lease for use of state property. We

find no support for such a narrow reading of DNR's leasing authority. As DNR correctly notes, "exclusive occupancy of the river surface, by precluding other surface uses, is effective occupancy of the underlying shoreland." *See Brusco Towboat Co. v. State*, 284 Or. 627, 589 P.2d 712, 719 (1978) ("The owner of the bed of a river is certainly entitled to prevent permanent structures on the surface of the water which preclude other uses of the bed, whether or not they actually rest on the bed itself.").

78. *See supra* Part IV.D.

79. *See Alaska Juneau Gold Mining Co. v. N. Lumber Mills*, 5 Alaska 269, 273 (D.Alaska Terr.1915) (right of access is one "of which, *when once it is vested*, the owner can only be deprived in accordance with the established law, and if necessary that it be taken for the public good, upon due

well after statehood, Alaska Riverways therefore cannot claim that it acquired any property interest protected by section 16.[80]

The legislature is free to balance the private right to wharf out with the public interest in recognizing a return from the exclusive use of state-owned lands. The legislature has done so by permitting, but not requiring, DNR to enter into leases with upland owners. DNR has exercised this discretion by categorically exempting upland owners who construct docks for personal, non-commercial use from lease requirements.[81] Should the legislature determine in the future that an upland owner's right to wharf out should not be limited by the state's interest in collecting revenue for the use of state-owned lands, it may change the law accordingly.

### 2. DNR's leasing decision does not constitute an improper retroactive application of AS 38.05.075(c).

While AS 38.05.070, enacted in 1959, first authorized DNR to enter into leases with riparian owners, it was AS 38.05.075(c), as amended in 1997, under which DNR actually issued the preference-right lease to Alaska Riverways. We must consider Alaska Riverways' argument that DNR's issuance of a lease under the current version of AS 38.05.075(c) for a dock built prior to its enactment constitutes a retroactive application of the statutory provision. Statutes are not to be applied retroactively unless the legislature expressly declares them to be retroactive.[82] This court has explained "retroactivity" as follows:

> A statute will be considered retroactive insofar as it gives to pre-enactment conduct a different legal effect from that which it would have had without passage of the statute. A statute creates this differ-

ent legal effect if it would impair rights a party had when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.[83]

The superior court found that the 1997 amendment to AS 38.05.075(c) first authorized DNR to require Alaska Riverways to enter into a lease and that such authorization could not be applied "retroactively" to abolish Alaska Riverways' right to wharf out. As we hold above, it was instead AS 38.05.070 that first authorized DNR to enter into leases with riparian owners for the adjacent shoreland if the appraised per annum value was under $250 or put the land up for public auction. The 1997 amendment simply gave DNR another leasing option under which it could grant Alaska Riverways a preference right and negotiate a lease directly. Rather than impairing Alaska Riverways' right to wharf out, it strengthened this right as it provided Alaska Riverways with a preference right to lease adjacent shorelands and made it less likely these shorelands would be put up for public auction. Nor was Alaska Riverways subject to new duties—both before and after the amendment, Alaska Riverways could be forced to pay rent to DNR if it entered into a lease with DNR.

Alaska Riverways has also failed to demonstrate that AS 38.05.075(c) increased Alaska Riverways' liability for maintaining its docks by authorizing DNR to charge a greater lease fee than it could have charged for years prior to the statute's enactment. From the date Alaska Riverways constructed the dock until the 1984 amendments to the leasing program, DNR would have had to place the lease up for public auction if the appraised per annum value of the lease was greater

compensation" (emphasis added) (citing *Yates v. Milwaukee*, 77 U.S. (10 Wall.) 497, 504, 19 L.Ed. 984 (1870))). Counsel for Alaska Riverways conceded this point at oral argument, recognizing that "to benefit from [article VIII, section 16], the right has to exist; you have to vest and obtain your common law right before the constitution entitles you to recover for your improvement."

**80.** We need not decide whether and to what extent the state may outright prohibit a riparian owner from constructing a wharf or require its removal where doing so would interfere with the

owner's access to water. Alaska Riverways has not argued, nor could it, that DNR's proposed lease would prevent it from exercising its right of access.

**81.** *See supra,* note 76.

**82.** AS 01.10.090.

**83.** *Rush v. State, Dep't of Natural Res.*, 98 P.3d 551, 555 (Alaska 2004) (internal quotation marks and footnote omitted).

than $250. But in 1984, AS 38.05.070(b) was amended to allow DNR to negotiate leases directly if their appraised per annum value was $5,000 or less.[84] In 1994, the per annum value of the Alaska Riverways lease was appraised at $925, well under $5,000. More than ten years later, DNR estimated the fair market value of the lease to be only slightly more, $1,000 per year. Therefore, beginning in 1984, DNR could have negotiated the lease directly with Alaska Riverways "on the limitations, conditions and terms that [it] considers are in the best interests of the state" after 1984.[85] Under the leasing decision, DNR seeks to collect back rent of $1,000 per year from 1991. This does not represent an increase in Alaska Riverways' liability for maintaining its docks prior to the 1997 amendment to AS 38.05.075(c) and is therefore not an improper retroactive application of that provision.

### 3. DNR's leasing decision does not violate Alaska Riverways' equal protection rights.

■ Alaska Riverways contends that DNR's requirement that it enter into a lease violates its equal protection rights under both the federal and state constitutions because DNR has not required all upland owners who build wharves to enter into leases.[86] Alaska Riverways argues that there is no rational basis for DNR to treat commercial and non-commercial users differently because "[a]nyone that physically occupies surface waters" is "equally effective at excluding others." Even if commercial and non-commercial users are not similarly situated for equal protection purposes, Alaska Riverways continues, DNR is improperly treating it

"differently than other similarly situated commercial users of surface waters."

The superior court rejected Alaska Riverways' equal protection arguments. First, it found that DNR's distinction between non-commercial and commercial users of state shoreland is "rationally related" to the "permissible government objective" that "commercial users should pay for the privilege of using state land in aid of making a profit." Second, it found that DNR's "distinction between large and small [commercial] operations is [ ] rationally related to prudent management of state land in that it is common sense that the larger businesses generally require larger docks, which occupy more state 'shoreland.' "

### a. Commercial vs. non-commercial users

■ The Uniform Application Clause and equal protection clauses of the United States and Alaska Constitutions require equal treatment only of persons "similarly situated." [87] "Concluding that two classes are not similarly situated necessarily implies that the different legal treatment of the two classes is justified by the differences between the two classes." [88] DNR argues that commercial and non-commercial users of state shoreland are not similarly situated. We agree. We have already held in various contexts that people using state land and resources for different purposes are not "similarly situated" for purposes of constitutional analysis, including sport and commercial fishermen,[89] residential and recreational purchasers of state land,[90] and Alaska resident and non-resident hunters.[91]

**84.** Ch. 152, § 27, SLA 1984.

**85.** AS 38.05.070(b).

**86.** Specifically, Alaska Riverways relies on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Equal Rights and Opportunities Clause of the Alaska Constitution, article I, section 1, and the Uniform Application Clause of the Alaska Constitution, article VIII, section 17.

**87.** *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (equal protection clause of federal

constitution); *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 44 (Alaska 1995) (Equal Rights and Opportunities Clause and Uniform Application Clause of state constitution).

**88.** *Shepherd*, 897 P.2d at 44 n. 12 (Alaska 1995).

**89.** *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994).

**90.** *Reichmann v. State, Dep't of Natural Res.*, 917 P.2d 1197, 1200 (Alaska 1996).

**91.** *Shepherd*, 897 P.2d at 43–44.

Similarly, we hold that riparian landowners using state land to construct wharves for private use are not similarly situated to those using state land to construct wharves for commercial use. The legislature has expressed an intention that DNR maximize the return on the leasing of state land.[92] Only commercial users earn revenue from their use of state lands and have this revenue available to compensate Alaskans for their exclusive use of state land.[93] Because they are not similarly situated, DNR may treat commercial and private users differently without implicating the equal protection clauses of the federal and state constitutions and the Uniform Application Clause.

### b. Differences in treatment among commercial users

■■ Even if DNR is justified in treating commercial and private users differently, Alaska Riverways argues that DNR is treating it differently from "other commercial users who are not necessarily tourist operations" by not requiring these other commercial operations to enter into a lease. Instead of citing specific examples, Alaska Riverways asks us whether "DNR [is] requiring a lease of every marina, port, fish processing plant, freight hauler, hunting or fishing lodge, or other commercial operation," suggesting that if not, DNR's lease decision would violate Alaska Riverways' equal protection rights. But it is Alaska Riverways, not DNR or this court, that bears the initial burden of identifying specific similarly situated users of state land that are not being required to enter into a lease. Alaska Riverways did not identify to the superior court any commercial opera-

tions similar in size that have not entered into a lease with DNR.

■■ Nor would such evidence alone be sufficient to make out an equal protection claim. Alaska Riverways further bears the burden of demonstrating that DNR's "[s]elective enforcement" of the leasing statute "is part of a deliberate and intentional plan to discriminate based on an arbitrary or unjustifiable classification." [94] It failed to present any such evidence. DNR, while acknowledging that "historically [it] has not authorized every commercial business with a dock," contends that "this has been due to insufficient resources to address all uses occurring on state land" rather than "purposeful discrimination." An agency need not—indeed, often cannot—apply a statute simultaneously to all similarly situated parties to avoid violating the equal protection clause so long as it is not intentionally discriminating against any party.

Because Alaska Riverways has failed to produce evidence showing that DNR does not require leases of other similarly situated commercial users and suggesting that DNR's selective application of the leasing statute to Alaska Riverways constitutes intentional discrimination, we hold that Alaska Riverways has failed to establish a violation of its equal protection rights.[95]

### G. Alaska Riverways' Challenge to DNR's Calculation of a Lease Fee Based on Passenger Count.

■■ Alaska Riverways argues in its cross-appeal that, even assuming DNR could require it to enter into a lease, DNR may not

---

**92.** *See, e.g.,* AS 38.05.075(a) (stating that for public auctions of leases, DNR should select the lease compensation method that "maximize[s] the return on the lease to the state").

**93.** *Cf. Fairbanks N. Star Borough Assessor's Office v. Golden Heart,* 13 P.3d 263, 273 (Alaska 2000) (concluding that lessees of low-value property are not similarly situated to a lessee of high-value property for purposes of city assessor's taxing policy).

**94.** *Gates v. City of Tenakee Springs,* 822 P.2d 455, 461 (Alaska 1991) (noting that "conclusory accusations of discrimination" are insufficient to make a prima facie case).

**95.** Alaska Riverways also argues that DNR is treating it differently than other commercial operations by charging rent based on a per-passenger fee rather than based on the area of state land occupied. Again, Alaska Riverways neither identifies similarly situated commercial users being charged rent based on other calculations, nor presents evidence that DNR is intentionally discriminating against Alaska Riverways in the selection of a user fee. The legislature has given DNR discretion to calculate a lease fee using different methods and to maximize the return for the state.

base the lease fee on the number of its paying passengers. First, Alaska Riverways contends that such a lease fee violates federal law prohibiting states from levying a tax for the use of navigable waters. Second, Alaska Riverways contends that DNR is not authorized by statute to charge such a lease fee.[96] We hold that DNR's calculation of a lease fee based on passenger count violates federal law and, consequently, need not consider Alaska Riverways' alternative argument that DNR lacks the statutory authority to charge such a fee. We therefore vacate that portion of the DNR leasing decision but leave in place the lease fee in the amount of $1,000 per year.

Alaska Riverways argues that requiring it to pay a lease fee based on its passenger count would violate 33 U.S.C. § 5(b), which provides with some exceptions:

> No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters.[97]

DNR argues that 33 U.S.C. § 5(b) does not apply because it is not charging vessels or passengers for use of the Chena River, but rather charging Alaska Riverways "rent" for its exclusive use and occupancy of state-owned shoreland in its capacity as a landowner. DNR cites *Brusco Towboat v. State* in support, in which the Oregon Supreme Court held that a lease fee did not violate an Oregon statute similar to 33 U.S.C. § 5(b) because the fee was not a "charge for the use of navigable waters," but rather "a charge upon those who wish to occupy, to the exclusion of others, portions of the state's lands in pursuit of their own business activities."[98] DNR ignores a crucial difference between this case and *Brusco Towboat:* In *Brusco Towboat,* the administrative agency did not attempt to calculate the lease fee based on passenger count but instead based the lease fee on the amount of water surface area occupied.[99]

The question here is whether the assessment of a lease fee based on passenger count for exclusive use of state land implicates 33 U.S.C. § 5(b). We hold that it does and reject DNR's argument that the fact that it calculates the "rent ... based on the number of [Alaska Riverways'] customers does not convert the rental amount into a 'passenger fee' or user fee." DNR's proposed assessment on Alaska Riverways, however labeled, is a charge exacted specifically for the use of navigable waters—in this case, $0.25 for each paying passenger—and 33 U.S.C. § 5(b) therefore applies.

The Ninth Circuit reached a similar conclusion in *Western Oil and Gas Association v. Cory,* where it held that California's practice of basing the lease fee for running a pipeline over unimproved state tidelands on the volume of oil passing through the pipeline violated the Commerce Clause of the United States Constitution.[100] In rejecting the argument by the State of California that it was only charging "rent" for the use of state-owned lands, the court stated:

> Although the volumetric rates are designated as "rent" by the State, it is the practical effect of an exaction, not its label that is the focus of analysis under the Commerce Clause. The volumetric charges are exacted specifically in return

**96.** Alaska Riverways also asserts that DNR's choice of a per-passenger lease fee, by forcing it to disclose "the volume of business it conducts," would be "a violation of [its] constitutionally protected privacy rights." Alaska Riverways failed to include this argument in its points on appeal and makes it in a single, conclusory sentence in its brief without citation to legal authority. It is therefore waived. *See, e.g., DeNardo v. Maassen,* 200 P.3d 305, 317 (Alaska 2009) ("[A]n issue is waived when a party fails to raise it in the points on appeal and then inadequately briefs the argument.").

**97.** 33 U.S.C. § 5(b) allows for "reasonable fees charged on a fair and equitable basis that (A) are used solely to pay the cost of a service to the vessel or water craft; (B) enhance the safety and efficiency of interstate and foreign commerce; and (C) do not impose more than a small burden on interstate or foreign commerce...."

**98.** 284 Or. 627, 589 P.2d 712, 724 (1978).

**99.** *Id.* at 717–18.

**100.** 726 F.2d 1340, 1344–45 (9th Cir.1984).

for the use of the coastal property. The present case therefore falls within the bounds of the Supreme Court cases that have reviewed "challenges to 'user' fees or 'taxes' that were designed and defended as a specific charge imposed by the State for the use of state-owned ... facilities and services." [101]

Similarly, in reversing a decision by this court rejecting a challenge to a port city's property tax on large vessels brought under the Tonnage Clause, the United States Supreme Court made clear that a state may not impose " 'taxes and duties *regardless of their name or form* ... which operate to impose a charge' " on the use of navigable waters.[102]

 While Alaska Riverways contends that the lease fee based on passenger count violates 33 U.S.C. § 5(b) rather than the Commerce or Tonnage Clauses, 33 U.S.C. § 5(b) codified the common law concerning these constitutional provisions.[103] 33 U.S.C. § 5(b), like the Commerce and Tonnage Clauses, prohibits levying fees on the use of navigable waters unless those fees do not impose a significant burden on interstate commerce and represent a fair approximation of the benefit conferred or cost incurred by the charging authority.[104] DNR does not argue that this exception applies, but rather that 33 U.S.C. § 5(b) (and the Commerce and Tonnage Clauses) are inapplicable because the assessment is not a user fee. For the reasons stated above, we disagree.

Having determined 33 U.S.C. § 5(b) to be applicable, the proposed lease fee based on passenger count is clearly impermissible because it does not approximate the benefit conferred or cost incurred by the State of Alaska.[105] The State has not argued that it provides facilities or services to Alaska Riverways or its passengers. Nor has the State shown that it incurs costs in leasing the unimproved shorelands to Alaska Riverways [106] above the administrative costs of processing the lease application and issuing the lease, and the litigation costs associated with this lawsuit.[107] The State does confer a benefit on Alaska Riverways and indirectly on its passengers: the exclusive use of state-owned shorelands. And the State may charge for this benefit. Importantly, however, a per-passenger lease fee is not a fair approximation of this benefit; indeed, it has no relation to this benefit. Whether Alaska Riverways has 100 or 100,000 passengers, the benefit conferred by the State is the same. Although DNR has authority to require commercial tour operations to enter into leases for the exclusive use of unimproved state-owned shorelands, it is prohibited by federal law from basing that charge on the number of passengers using navigable waters.

## V. CONCLUSION

We hold that DNR has authority to require Alaska Riverways to enter into a lease

---

101. *Id.* at 1344 (quoting *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 615, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981)) (citations omitted).

102. *Polar Tankers, Inc. v. City of Valdez,* —— U.S. ——, ——, 129 S.Ct. 2277, 2283, 174 L.Ed.2d 1 (2009) (emphasis added) (quoting *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 265–66, 56 S.Ct. 194, 80 L.Ed. 215 (1935)).

103. *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,* 566 F.Supp.2d 81, 102 (D.Conn.2008) ("the requirements [of 33 U.S.C. § 5(b) ] closely track[ ] the Commerce Clause and Tonnage Clause cases"); *Moscheo v. Polk County,* No. E2008–01969–COA–R3–CV, 2009 WL 2868754, at *15 (Tenn.App. Sept. 2, 2009) ("[t]he exception noted in 33 U.S.C. § 5(b)(2) tracks [the] language" of the exception to the Tonnage Clause carved out by the Supreme Court).

104. *See Bridgeport & Port Jefferson Steamboat Co.,* 566 F.Supp.2d at 96, 101–02.

105. *Cf. W. Oil & Gas Ass'n,* 726 F.2d at 1345 ("We are of the opinion that the volumetric rates are a disguised revenue raising measure.... There is no correlation between benefits conferred by the State and the throughput charges.").

106. *See Keokuk N. Line Packet Co. v. Keokuk,* 95 U.S. 80, 88–89, 24 L.Ed. 377 (1877) (noting that under Tonnage Clause, city cannot "collect wharfage ... for the use of that which is not a wharf, but merely the natural and unimproved shore of a navigable river"); *W. Oil & Gas Ass'n,* 726 F.2d at 1345 (finding a violation of the Commerce Clause where the state charged for use of "unimproved" lands on which "no services or facilities [were] provided").

107. DNR does not argue that the lease fee is intended to cover administrative costs. DNR charged Alaska Riverways a small filing fee when it applied for the lease in question, presumably to defray such costs.

for its exclusive use of state-owned shore-lands but that DNR's choice of a lease fee based on passenger count violates federal law. We therefore REVERSE the superior court's decision and VACATE the portion of the lease fee based on passenger count, leaving in place the lease amount of $1,000 per year.

CARPENETI, Chief Justice, EASTAUGH, and WINFREE, Justices, not participating.